UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles E. HAMILTON,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles Eugene HAMILTON,
Defendant-Appellant.

Nos. 84–5060, 84–5063.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1985.

Decided June 19, 1986.

William Fahey, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Robert L. Allen, Los Angeles, Cal., for defendant-appellant.

Before WALLACE, HUG and HALL, Circuit Judges.

WALLACE, Circuit Judge:

Hamilton appeals from his conviction on seven counts of armed robbery in violation of 18 U.S.C. § 2113(a), (d). Hamilton argues that he was denied his sixth amendment right to effective assistance of counsel, that the district judge should have recused himself, that he was deprived of the right to be absent from trial, that a photographic spread was unduly suggestive, that parts of three jury instructions were prejudicial, and that the district judge erred in admitting certain evidence. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

On July 12, 1983, a man robbed the Union Federal Savings and Loan of Newbury Park, California. A Ventura County, California, deputy sheriff heard a broadcast reporting that the robbery had occurred and that the suspect was a black man driving a white Cadillac.

A short time thereafter, the deputy sheriff saw a vehicle and driver matching the description given in the broadcast. With the assistance of other law enforcement officers, he stopped the vehicle and ordered the occupants to step out. Hamilton got out of the vehicle, along with Sheila Davis, a female co-defendant. Witnesses at the bank identified Hamilton as the robber, and he was arrested.

The next day, Federal Bureau of Investigation (FBI) agent Ahles contacted Gregory Jones, the owner of the white Cadillac that Hamilton was driving when he was arrested. Jones told agent Ahles that he had loaned the car to Davis for a few hours on the day of the robbery, and that he had gone to Davis's home to look for it when the Cadillac had not been returned. Jones stated that he had observed a motor home at Davis's premises and had noticed people removing articles from the house and placing them within the motor home. Jones gave agent Ahles the license plate number of the motor home and told him that the motor home had been moved and could be found at an address on Van Ness Avenue in Los Angeles. Agent Ahles determined from an investigation of the license plate number that the owner of the motor home was Frank Crawford.

Agent Ahles notified FBI agents Powers and Flanigan by radio of the location of the motor home and described the evidence he thought the agents would find inside. Agents Powers and Flanigan found the motor home at the Van Ness address. They contacted their office by radio and were advised of the name and address of a third person who was the registered owner of the motor home, and were informed that the registration was not current.

When the agents approached the home, they were greeted by Hamilton's mother, Claudia Cosbie. The motor home was parked in the driveway of Cosbie's home and was attached to the home's electric utilities by an extension cord. The door of the motor home was open and two teenage girls were inside listening to the radio. The agents observed Cosbie enter the mo-

tor home several times; on at least one occasion, Cosbie instructed the two teenage girls to cooperate with the questions of the agents. Cosbie told the agents that she did not know who owned the motor home but that it was driven onto her property by a grandson and that she believed it was owned by Hamilton, her son.

Based on these circumstances, the agents believed that Cosbie had free and complete access to the motor home. Consequently, they asked her if they could search the motor home, and she consented. The search produced several articles of clothing, which later were introduced at trial.

Hamilton was charged in two indictments with ten counts of armed robbery in violation of 18 U.S.C. § 2113(a), (d). Prior to trial, Hamilton filed three motions to relieve his court-appointed counsel and one motion to suppress evidence, all of which were denied. The government's motion to dismiss count four of the first indictment was granted. Counts six and seven of the first indictment were severed prior to trial and later dismissed. A jury found Hamilton guilty of seven counts of armed robbery, and he was sentenced to 40 years in prison.

## II

Hamilton first contends that he was denied his sixth amendment right to effective assistance of counsel because his attorney's performance was deficient and prejudicial. *See Strickland v. Washington,* 466 U.S. 668, 685–86, 104 S.Ct. 2052, 2063–64, 80 L.Ed.2d 674 (1984) (*Strickland*). Our review of counsel's performance is highly deferential and we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2066.

■ Hamilton argues that his appointed attorney should not have represented him because they were unable to communicate. Our review of the record indicates, however, that any lack of communication between Hamilton and his attorney prior to

trial resulted from Hamilton's unwillingness to cooperate and his efforts to delay the trial. Once trial began, Hamilton cooperated with his attorney, assisted in selecting the jury, made suggestions for cross-examining witnesses, and even complimented his attorney on his efforts to defend him.

Hamilton next argues that his attorney's performance was deficient because he did not object to three jury instructions and to the trial judge's refusal to recuse himself. Since these objections are without merit, *see infra,* Hamilton's attorney did not err in failing to raise them.

■ Hamilton also contends that his attorney failed to present a defense at the close of the government's case. Hamilton never indicates, however, what evidence should have been presented. Under these facts, all Hamilton's attorney could do was what he did do: cross-examine the government's witnesses. Since Hamilton has failed to prove that his attorney's performance was deficient, we need not address whether it was prejudicial. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.

## III

■ Hamilton next argues that the district judge should have recused himself because Hamilton appeared before him in a state court proceeding 15 years earlier. We will reverse a district judge's decision not to recuse himself only if the decision was an abuse of discretion. *United States v. DeLuca,* 692 F.2d 1277, 1282 (9th Cir. 1982). The district judge stated that he had no recollection of the 15-year-old state court proceeding. We can find no reasonable basis to question the district judge's impartiality, *see* 28 U.S.C. § 455(a); *Trotter v. International Longshoremen's Union, Local 13,* 704 F.2d 1141, 1144 (9th Cir. 1983), and the record contains no evidence of bias or prejudice, *see* 28 U.S.C. § 455(b)(1). Therefore, the district judge did not abuse his discretion in declining to recuse himself.

## IV

■ Hamilton also contends that he was deprived of the right voluntarily to absent himself from trial. No cases are cited by Hamilton in support of this unique contention. To the contrary, the Third Circuit has concluded that a defendant has neither a due process right nor a right stemming from Fed.R.Civ.P. 43 to be absent from trial. *See United States v. Moore,* 466 F.2d 547, 548 (3d Cir.1972), *cert. denied,* 409 U.S. 1111, 93 S.Ct. 920, 34 L.Ed.2d 692 (1973). We need not decide, however, whether we agree with the Third Circuit because this record does not require us to do so. The district judge allowed Hamilton to be absent except for in-court identification by witnesses. Hamilton was required to be in the holding area of the courthouse to facilitate this. Because he was in the court building anyway, Hamilton decided to be present during the trial. Thus, he failed to preserve his claim to the alleged right for purposes of this appeal.

## V

■ Hamilton next argues that the photographic display used in the investigation violated his due process rights. Due process, however, is not violated unless the photographic display results in a very substantial likelihood of irreparable misidentification in light of the totality of circumstances. *See United States v. Field,* 625 F.2d 862, 865–66 (9th Cir.1980). A suggestive photographic display "will not be held to violate due process if sufficient indicia of reliability are present." *United States v. Hanigan,* 681 F.2d 1127, 1133 (9th Cir. 1982), *cert. denied,* 459 U.S. 1203, 103 S.Ct. 1189, 75 L.Ed.2d 435 (1983).

Hamilton contends that the photographic display was unduly suggestive because two of the six photographs used were of the same individual and two others were of individuals nearly identical in appearance. We have reviewed the photographs and agree with the district court that even if the display included photographs of only five individuals instead of six, it was not unduly suggestive. *See United States v.*

*Bagley,* 772 F.2d 482, 493 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986).

## VI

■ Hamilton contends that parts of three jury instructions were prejudicial. He argues that certain phrases in the three instructions "urge[d] a unanimous verdict" and "presume[d] that the jury [would] return with a guilty verdict." Hamilton did not object to the three instructions, however, as required by Fed.R.Crim.P. 30. Therefore, we will reverse only if the allegedly prejudicial phrases constituted plain error. *See* Fed.R.Crim.P. 52(b). "Plain error exists only if it is highly probable that the error materially affected the verdict." *United States v. Williams,* 685 F.2d 319, 321 (9th Cir.1982). "[R]eversal for plain error is appropriate only when necessary to safeguard the integrity and reputation of the judicial process or to forestall a miscarriage of justice." *United States v. Lancellotti,* 761 F.2d 1363, 1367 (9th Cir.1985).

The jury instructions given by the district judge were the standard ones used in this type of case and, taken in context, they do not have an improper meaning. The jury was properly instructed that Hamilton was presumed innocent and that he should be acquitted if there was a reasonable doubt as to his guilt. Consequently, there was no error in the jury instructions.

## VII

Hamilton contends that the district court erred in admitting certain items of evidence seized during the warrantless search of the motor home. We conclude that the evidence was properly admitted because agents Powers and Flanigan could in good faith reasonably rely on Cosbie's apparent authority to consent to the search of the motor home or, in the alternative, because the search of the motor home falls within the "vehicle exception" to the warrant clause.

## A.

■ Hamilton contends that the district court erred in concluding that agents Powers and Flanigan reasonably could have relied on Cosbie's apparent authority to consent to the search of the motor home. It is not clear whether we review a district court's finding of apparent authority to consent de novo or for clear error. In *United States v. Dubrofsky*, 581 F.2d 208 (9th Cir.1978) (*Dubrofsky*), the issue of voluntariness of the consent as well as authority to give the consent was before us. We reviewed the voluntariness issue pursuant to the clearly erroneous standard. *Id.* at 212; *see also LaDuke v. Nelson*, 762 F.2d 1318, 1321 (9th Cir.1985); *United States v. Caicedo-Guarnizo*, 723 F.2d 1420, 1423 (9th Cir.1984). It appears from a reading of *Dubrofsky* that our court also applied the clear error test to the issue of authority to consent to the search. 581 F.2d at 212.

Subsequently, however, in *United States v. McConney*, 728 F.2d 1195 (9th Cir.) (en banc) (*McConney*), *cert. denied*, —— U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), we created a method of analysis in determining the standard of review:

> If application of the rule of law to the facts requires an inquiry that is "essentially factual,"—one that is founded "on the application of the fact-finding tribunal's experience with the mainsprings of human conduct,"—the concerns of judicial administration will favor the district court, and the district court's determination should be classified as one of fact reviewable under the clearly erroneous standard. If, on the other hand, the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo.

*Id.* at 1202 (citations omitted). It may be that the Supreme Court would treat the issue as essentially factual. In *Thompson v. Louisiana*, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984) (per curiam), the Court treated an argument raised by the State dealing with consent. The Louisiana Supreme Court attempted "to support its diminished expectation of privacy argument by reference to the daughter's 'apparent authority' over the premises when she originally permitted the police to enter." *Id.*, 105 S.Ct. at 412. Although the issue was not reached, the Court's response in dicta seems to show that the Court would review the issue as essentially factual: "Because the issue of consent is ordinarily a factual issue unsuitable for our consideration in the first instance, we express no opinion as to whether the search at issue here might be justified as consensual." *Id.*

It is unnecessary in this case, however, to decide whether the issue of apparent authority to consent is essentially factual and thus whether our standard of review should be de novo or for clear error. Under either standard, we would conclude that a valid consent was given.

The fourth amendment prohibits searches conducted without a warrant unless they fall within a " 'few specifically established and well-delineated exceptions.' " *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (*Schneckloth*), *quoting Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). One such exception is a search conducted pursuant to proper consent voluntarily given. *See United States v. Matlock*, 415 U.S. 164, 165–66, 94 S.Ct. 988, 990–91, 39 L.Ed.2d 242 (1974) (*Matlock*); *Schneckloth*, 412 U.S. at 219, 93 S.Ct. at 2043. Proof of voluntary consent, however, is not limited to proof that consent was given by the defendant. Valid consent to search can be "obtained from a third party who possessed common authority over or other sufficient relationship to the premises." *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993.

We need not determine whether Cosbie actually possessed common authority over or other sufficient relationship to the motor home in order to affirm the district judge's

denial of Hamilton's motion to suppress evidence. Rather, we must determine whether agents Powers and Flanigan "in good faith relie[d] on what reasonably, if mistakenly, appear[ed] to be [Cosbie's] authority to consent to the search." *United States v. Sledge,* 650 F.2d 1075, 1081 (9th Cir.1981).

Agents Powers and Flanigan found the motor home parked in the driveway of Cosbie's home with the door open. The motor home had been driven to her home by a grandson, was occupied by teenagers under Cosbie's apparent supervision, and was connected to her home by an electrical cord. Cosbie entered the motor home several times in the presence of the agents. Based on these facts, the district judge did not err in finding that the agents reasonably could have concluded that Cosbie had either common authority over or a sufficient relationship to the motor home to give consent. *See United States v. Miller,* 688 F.2d 652, 658 (9th Cir.1982) (son had sufficient access and control to consent to search of father's shop and surrounding area); *Dubrofsky,* 581 F.2d at 212 (party who has key and access throughout can consent to search); *United States v. Gulma,* 563 F.2d 386, 389 (9th Cir.1977) (possessor of motel key could consent to search even though he had never been to the room and stated that it was not his); *United States v. Murphy,* 506 F.2d 529, 530 (9th Cir.1974) (per curiam) (possessor of key to warehouse could give consent even though he had key only when performing work on the premises), *cert. denied,* 420 U.S. 996, 95 S.Ct. 1433, 43 L.Ed.2d 676 (1975).

Hamilton argues that the agents could not reasonably rely on Cosbie's authority to consent because she did not know who ultimately owned the motor home. We disagree. Knowledge of ultimate ownership is not a necessary prerequisite to a valid consent. The inability to declare who owns a home, an apartment, or a motor home, although a relevant consideration, does not prevent government representatives from reasonably relying on an individual's apparent authority to consent so long as sufficient other facts exist to indicate common authority over or a sufficient relationship to the premises.

### B.

■ Even if we were to conclude that the district court did err in finding that the agents reasonably could rely on Cosbie's apparent authority to consent, we still would affirm the district judge's denial of the motion to suppress. An additional exception to the warrant clause is the long-recognized "vehicle exception." *See Chambers v. Maroney,* 399 U.S. 42, 51–52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925) (*Carroll*). The vehicle exception has two principal justifications. First, automobiles or other vehicles can be moved quickly outside the jurisdiction of the magistrate from whom the warrant must be sought. *See South Dakota v. Opperman,* 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) (*Opperman*); *Carroll,* 267 U.S. at 153, 45 S.Ct. at 285. Second, the expectation of privacy in one's vehicle is reduced by the pervasive regulations governing vehicles capable of traveling upon public roads. *See Opperman,* 428 U.S. at 367–68, 96 S.Ct. at 3096–97; *Cady v. Dombrowski,* 413 U.S. 433, 440–41, 93 S.Ct. 2523, 2527–28, 37 L.Ed.2d 706 (1973).

In *California v. Carney,* —— U.S. ——, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (*Carney*), the Supreme Court held that under certain circumstances a motor home can fall within the vehicle exception because it evokes concerns similar to those surrounding automobiles and other readily-mobile highway vehicles. The Court emphasized that when a vehicle is readily capable of use on the highways "and is found stationary in a place not regularly used for residential purposes—temporary or otherwise—the two justifications come into play." *Id.,* 105 S.Ct. at 2070. The fact that a motor home might be used as a residence is not controlling. *Id.* at 2070–71. Thus, warrantless searches of motor homes are not unreasonable under the

fourth amendment when based upon probable cause existing at the time of the search.

The Court recognized, however, that extending the vehicle exception to motor homes would not be appropriate under some circumstances. Consequently, the Court limited its decision by stating:

> We need not pass on the application of the vehicle exception to a motor home that is situated in a way or place that objectively indicates that it is being used as a residence. Among the factors that might be relevant in determining whether a warrant would be required in such a circumstance is its location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road.

*Id.* at 2071 n. 3.

*Carney* involved the search of a motor home located in a public parking lot in downtown San Diego, California. This case requires us to consider the application of the vehicle exception when the motor home is located in a private residential driveway and is connected to the residence by an extension cord. Because there is no showing that the agents were on the premises illegally, we need not decide what, if any, limitations restrict a law enforcement officer's ability to enter onto privately-owned land to conduct a vehicle search. *See, e.g., United States v. Moscatiello,* 771 F.2d 589, 599–600 (1st Cir.1985); *United States v. Amuny,* 767 F.2d 1113, 1125–28 (5th Cir.1985).

We find that the search of the motor home falls within the scope of the vehicle exception. The mobility of the motor home is amply demonstrated by the fact that it was moved the night before the search was conducted. Although the registration had lapsed, the motor home was licensed with the State of California. Because it was located in a residential driveway, it had easy access to a public road. The fact that the motor home was attached to "utilities" in the broad sense is not very significant. A connection to electrical utilities by means of an extension cord is hardly the kind of "pipe and drain" connection that would render the motor home more permanent and less mobile as was contemplated by the Court in *Carney.*

Hamilton does not contend that the police lacked probable cause to arrest him. His connection with the robberies with which he was charged was well-established and would have supported a warrant to search his residence for evidence of the crimes. Similarly, when the agents learned of articles of clothing being removed from the residence and placed in the motor home, probable cause existed to search the motor home as well. Therefore, we conclude that the articles of clothing seized during the warrantless search of the motor home could have been properly admitted under the vehicle exception.

AFFIRMED.

HUG, Circuit Judge, concurring in part and dissenting in part.

I concur in parts I–VI of the majority opinion, and in part VII for the reason expressed in sub-part A. I find it unnecessary to reach the issues in sub-part B.

Were it necessary to reach those issues, I would dissent, on the ground that this is an unwarranted extension of the "vehicle exception." I see a significant difference in the expectancy of privacy in a motor home located in a public parking lot, such as involved in *California v. Carney,* — U.S. ——, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), and a motor home located in a private driveway under the circumstances involved in this case. Here the motor home was connected with the utilities in the residence. The persons utilizing the motor home were not persons who would be driving the vehicle away before a warrant could be obtained, but teenagers under the supervision of the resident of the house. The location and use being made of this vehicle was much more akin to a functional part of a private residence than to a motor vehicle on the highway, where the vehicle exception is meant to apply.

CYNTHIA HOLCOMB HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in all but Part VII A of the majority opinion. I cannot join in that portion of the opinion because I believe that under the facts of this case the police could not have reasonably believed that Claudia Cosbie had authority to consent to the warrentless search of the motor home.

## I

As an initial matter, I disagree with the majority opinion's implication that the issue of whether Cosbie had sufficient authority under the fourth amendment to consent to a search of a motor home should be reviewed under the clearly erroneous standard. In my view, the question of whether Cosbie's consent, freely and voluntarily given, was binding on Hamilton for the purposes of the fourth amendment "requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests." *United States v. McConney*, 728 F.2d 1195, 1205 (9th Cir.) (en banc), *cert. denied*, — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). It is a question not altogether different from the questions of exigent circumstances and probable cause, questions which this court has already decided warrant de novo review. *Id.* at 1200 n. 4, 1204–05.

In *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), the police asked the defendant's cousin during the cousin's arrest where they could find the cousin's clothing. The cousin then pointed the police to a duffel bag located within his home. The court concluded that because the cousin had at least joint use of the bag, the police's search of the bag was proper and that belongings of the defendant seized incident to the lawful search were properly admitted. *Id.* at 740, 89 S.Ct. at 1425. The Court's decision is best understood as holding that the cousin had authority to consent to a search of the bag as far as his own belongings were concerned and that, this consent being valid, the clothing of the defendant also seized during the lawful search could also be admitted.

While this decision relied upon certain factual findings dealing with the use of the bag, it also made judgments about property of others seized incident to a lawful search. These questions involve a mix of fact and law. The fact that these questions involve the "exercise [of] judgment about the values that animate legal principles" is born out by the Court's discussion. *McConney*, 728 F.2d at 1202. The defendant claimed that he had given his cousin the use of only certain compartments within the bag. While this *fact* deals with the extent of mutual use, the Court concluded that it was *legally irrelevant* stating:

> Petitioner argues that Rawls only had actual permission to use one compartment of the bag and that he had no authority to consent to a search of the other compartments. *We will not, however, engage in such metaphysical subtleties in judging the efficacy of Rawls' consent.*

*Frazier*, 394 U.S. at 740, 89 S.Ct. at 1425 (emphasis added). The Court noted further that the defendant *"must be taken to have assumed the risk* that Rawls would allow someone else to look inside." *Id.* (emphasis added).

*United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) provides an even stronger example of the inherently legal nature of the consent issue. The Court stated that the appropriate inquiry in these consent cases requires a finding that the third party "possessed common authority over *or other sufficient relationship* to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171, 94 S.Ct. at 993 (emphasis added). While a trial court may be in the best position to determine the actual extent of mutual use, the question of whether these facts constitute a "sufficient relationship" for the purposes of the fourth amendment is an inherently legal one.

These cases, coupled with the teachings of *McConney*, lead me to the conclusion that de novo review is appropriate on the

consent issue presented here. Because we have expressly reserved this question, Cosbie's consent is sufficient to support the district court's decision to admit the articles of clothing only if we would reach the same conclusion as the district court after a de novo review of the record.[1]

## II

Under a de novo standard of review, I cannot agree with the majority that the agents could reasonably believe that Cosbie had authority to consent to the search.

In *United States v. Dubrofsky*, 581 F.2d 208 (9th Cir.1978), we held that "[a] party who has a key to the premises and access throughout the residence can also give a valid consent to search." *Id.* at 212. I would concede that, absent an express statement to the contrary, actions consistent with ownership or consensual mutual use of the property are sufficient to justify an officer's good faith belief that the third party had authority to consent to a search of the premises. Likewise in *Matlock*, mutual use of the premises without indications to the contrary was also sufficient to support a search.

Suppose, however, that in *Dubrofsky* the person having the key to the premises had told the law enforcement officers "I have the key, but I do not own the house and I am only supposed to go inside to feed the dog." I do not think that in this case the police would be justified in having a good faith belief that the person had authority to consent to the search of the premises. Further, the owner of the house would not have "assumed the risk" that law enforcement officers would be admitted.

This case falls in between *Dubrofsky* and the hypothetical posited above. In my opinion, it falls closer to the latter. The actions taken by Cosbie, taken alone, would justify a conclusion that she had mutual use of the property and authority to admit the officers.[2] Every action she took was consistent with this mutual use, and the conclusion of the FBI officers that she had authority to consent would have been justified.

The conclusion was not reasonable after Cosbie made an express disclaimer of ownership and after she indicated that she did not know who owned the motor home. The statement called into question her authority to consent based upon mutual use of the property. Cosbie may have had access to the motor home only for narrow and limited purposes, like, for example, moving the motor home so that she could move her vehicle through the driveway. At the very least, the officers should have inquired further about the extent of her access to the motor home.

Further, agents Powers and Flanigan contacted their office before approaching Cosbie at the Van Ness address. They were informed at that time that motor vehicle records showed Frank Crawford as the owner of the motor home, not either Hamilton or Cosbie. The agents made no effort to contact him or to garner his consent to a search of the vehicle. Powers and Flanigan could not have been surprised when Cosbie stated that she did not know who owned the motor home nor could they have been deceived by Cosbie's statement that she thought the motor home belonged to Hamilton. The agents knew otherwise. In fact, after their conversation with Cosbie, the agents could only have been left with the impression that Cosbie knew little or nothing at all about where the motor home had come from or to whom it belonged. Given how little Cosbie knew, the agents could not have reasonably believed that Cosbie had authority to consent to a search of the vehicle.

---

1. *Thompson v. Louisiana,* 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984) does not compel a different conclusion. In *Thompson,* the police testified that they received no consent to search. The Court noted that any finding of consent in that case would have to be gauged by the standards articulated in *Matlock.*

2. As the majority opinion notes, Cosbie entered and exited the motor home several times in the presence of the agents.

Although I do not agree with Part VII A of the majority opinion, nonetheless I would affirm the conviction in this case for the reasons set forth in Part VII B of the majority opinion.